UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JASON SCHEAR, EDUARD STANCIU,
BAREKET DRORI, STELLA KIM, DANA
BEIERLE, MICHAEL MARTINEZ and ODIN
REDD, on behalf of themselves and others similarly
situated,

                Plaintiffs,

        -against-

FOOD SCOPE AMERICA, INC. d/b/a MEGU
TRIBECA, MASAHIRO ORIGUCHI, KOICHI
YOKOYAMA and SALVATORE PICARDI,

                Defendants.

No. 12-CV-0594 (AT)

**Filed VIA ECF**

---

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
# MOTION FOR SUMMARY JUDGMENT

---

LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY  10022
Attorneys for Defendants

Of counsel:

    Andrew P. Marks
    Adam Colón

# TABLE OF CONTENTS

**PAGE**

I.  PRELIMINARY STATEMENT ................................................................. 1

II.  STATEMENT OF FACTS ..................................................................... 3

    A.  The Restaurant and Working Hours ............................................ 3

    B.  The Defendants ............................................................................ 6

        1.  Food Scope ........................................................................ 6

        2.  Masahiro Origuchi ............................................................ 7

        3.  Koichi Yokoyama ............................................................. 7

        4.  Salvatore Picardi ............................................................. 8

    C.  Job Duties of Challenged Tip Pool Participants ........................ 8

        1.  Sushi Bar ........................................................................... 8

        2.  Busser/Stocker ................................................................. 10

        3.  Runner/Expeditor ............................................................. 11

        4.  Event Coordinators ........................................................... 13

    D.  United States Department of Labor Reviews and Approves Megu Tip Pool ...... 13

    E.  Prior Litigation Regarding Megu Tip Pool Gains No Traction ........................... 14

III.  ARGUMENT .................................................................................. 14

    A.  Standard of Review ...................................................................... 14

    B.  There is no Admissible Evidence that Plaintiffs were Denied Overtime Pay ................. 15

    C.  Megu Fully Complied with New York Minimum Wage Law ............................. 19

    D.  The First Claims for Relief Should be Dismissed in Whole or in Part Because Megu's Tip Pool was Compliant with the FLSA and/or the Claims of Some Plaintiffs are Barred by the Statute of Limitations ................... 21

        1.  Megu's Tip Pool was FLSA Compliant ....................................... 21

# TABLE OF CONTENTS
## (CONTINUED)

|  |  | 2. | Plaintiffs' FLSA Claims are Barred by the Statute of Limitations | 25 |

E.  The Fifth Claim for Relief Should be Dismissed Because Megu's Tip Pool Was Compliant with New York State Law ........................................................ 26

F.  Summary Judgment Should be Granted to the Individual Defendants in Whole or in Part ....................................................................................... 28

    1.  There is no Individual Liability Under New York State Law ................. 28

    2.  Mr. Origuchi Is Not Any Plaintiffs' Employer for Purposes of the FLSA ............................................................................................ 32

IV.  CONCLUSION .......................................................................................... 37

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abdrabo v. New York - Worker Comp. Bd.,*
  2005 U.S. Dist. LEXIS 10317 (S.D.N.Y. May 27, 2005)................................................25

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)........................................................................................................15

*Andux v. Woodbury Auto Park, Inc.,*
  30 A.D.3d 362 (2d Dep't 2006) ......................................................................................31

*Arencibia v. 2401 Rest. Corp.,*
  831 F. Supp. 2d 164 (D. D.C. 2011) ...............................................................................24

*Barenboim v. Starbucks Corp.,*
  2013 N.Y. LEXIS 1678 (N.Y. June 26, 2013).................................................................27

*Baystate Alt. Staffing, Inc. v. Herman,*
  163 F.3d 668 (1st Cir. 1998)...........................................................................................32

*Bravo v. Eastpoint Int'l, Inc.,*
  2001 U.S. Dist. LEXIS 3647 (S.D.N.Y. Mar. 30, 2001) .................................................34

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986)........................................................................................................14

*Chao v. Vidtape, Inc.,*
  196 F. Supp. 2d 281 (E.D.N.Y. 2002), *modified on other grounds*, 66 Fed. Appx. 261
  (2d Cir. 2003).................................................................................................................34

*Clarke v. JPMorgan Chase Bank, N.A.,*
  2010 U.S. Dist. LEXIS 33264 (S.D.N.Y. Mar. 26, 2010) ...............................................25

*Copantitla v. Fiskardo Estiatorio, Inc.,*
  788 F. Supp. 2d 253 (S.D.N.Y. 2011)..............................................................................31

*D'Amico v. City of N.Y.,*
  132 F.3d 145 (2d Cir. 1998), *cert. denied*, 524 U.S. 911 (1998)....................................15

*DeJesus v. HF Mgmt. Servs., LLC,*
  2013 U.S. App. LEXIS 16105 (2d Cir. Aug. 5, 2013)......................................................16

*Diaz v. Consortium for Worker Educ., Inc.,*
  2010 U.S. Dist. LEXIS 107722 (S.D.N.Y. Sept. 28, 2010).............................................33

# TABLE OF AUTHORITIES
## (CONTINUED)

PAGE(S)

*Edwards v. The City of N.Y.*,
    2011 U.S. Dist. LEXIS 97134 (S.D.N.Y. Aug. 26, 2011) ......................................25

*Ershow v. Site Holdings, Inc.*,
    1995 U.S. Dist. Lexis 8908 (S.D.N.Y. 1995) ........................................................30

*Flannigan v. Vulcan Power Group, LLC*,
    712 F. Supp. 2d 63 (S.D.N.Y. 2010).....................................................................31

*Garcia v. La Revise Assocs., LLC*,
    2011 U.S. Dist. Lexis 3325 (S.D.N.Y Jan. 13, 2011) ..........................................24

*Giuffre v. Marys Lake Lodge, LLC*,
    2012 U.S. Dist. Lexis 140506 (D. Colo. Sept. 28, 2012) ......................................23

*Grain Traders v. Citibank, N.A.*,
    160 F.3d 97 (2d Cir. 1998).....................................................................................15

*Gray v. Powers*,
    673 F.3d 352 (5th Cir. 2012) .................................................................................35

*Heng Chan v. Sung Yue Tung Corp.*,
    2007 U.S. Dist. LEXIS 7770 (S.D.N.Y. Feb. 1, 2007).........................................34

*Herman v. RSR Sec. Servs.*,
    172 F. 3d 132 (2d Cir. 1999).................................................................................33

*In re Enter. Rent-A-Car*
    683 F.3d 462 (3d Cir. 2012)..................................................................................34

*Irizarry v. Catsimatidis*,
    722 F.3d 99 (2d Cir. 2013)..................................................................31, 32, 33

*Jankowski v. Castaldi*,
    2006 U.S. Dist. LEXIS 4237 (E.D.N.Y. Jan. 11, 2006) .......................................34

*Kuebel v. Black & Decker, Inc.*,
    643 F.3d 352 (2d Cir. 2011)........................................................16, 17, 18

*Lundy v. Catholic Health Sys. of Long Island Inc.*,
    711 F.3d 106 (2d Cir. 2013)..................................................................................16

# TABLE OF AUTHORITIES
### (CONTINUED)

PAGE(S)

*Martin v. Spring Break '83 Prods., LLC,*
  2012 U.S. App. LEXIS 15285 (5th Cir. July 24, 2012)..............................35

*Mendez v. Stone Pizza, LLC,*
  2012 U.S. Dist. LEXIS 108591 (S.D.N.Y. Aug. 1, 2012).........................35

*Michalek v. Amplify Sports and Entm't LLC,*
  2012 U.S. Dist. Lexis 85727 (S.D.N.Y. June 20, 2012)..........................31

*Nakahata v. New York-Presbyterian Healthcare Sys., Inc.,*
  723 F.3d 192 (2d Cir. 2013)..................................................16

*Parker v. Sony Pictures Entertainment, Inc.,*
  260 F.3d 100 (2d Cir. 2001)..................................................14

*Patrowich v. Chemical Bank,*
  63 N.Y.2d 541, 473 N.E.2d 11, 483 N.Y.S.2d 659 (1984)...............30, 31, 32

*Perez v. Sanford-Orlando Kennel Club, Inc.,*
  515 F.3d 1150 (11th Cir. 2008) ..............................................33

*Reese v. Lyons Equip. Co. Inc.,*
  436 B.R. 281 (W.D.N.Y. 2010) ................................................31

*Renzler v. D.F. White, Inc.,*
  267 A.D.2d 443 (2d Dep't 1999) ..............................................31

*Robles v. Copstat Sec., Inc.,*
  2009 U.S. Dist. Lexis 54963 (S.D.N.Y. June 29, 2009).....................30, 31

*Samiento v. World Yacht, Inc.*
  10 N.Y.3d 70, 883 N.E.2d 990 (2008).........................................26

*Sampson v. MediSys Health Network, Inc.,*
  2012 U.S. Dist. LEXIS 103052 (E.D.N.Y. July 24, 2012)........................35

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.,*
  659 F.3d 234 (2d Cir. 2011)...........................................21, 26, 27

*Solis v. Cindy's Total Care, Inc.,*
  2012 U.S. Dist. LEXIS 1808 (S.D.N.Y. Jan. 5, 2012)..........................35

# TABLE OF AUTHORITIES
## (CONTINUED)

PAGE(S)

*Stewart v. CUS Nashville, LLC,*
2013 U.S. Dist. LEXIS 111802 (M.D. Tenn. Aug. 8, 2013) ...................................22

*Stoganovic v. Dinolfo,*
61 N.Y.2d 812, 462 N.E.2d 149, 473 N.Y.S.2d 972 (1984)...............................29, 30, 31, 32

*Stoganovic v. Dinolfo,*
92 A.D.2d 729, 461 N.Y.S.2d 121 (4th Dep't 1983) ..............................................30

*Tandor Rest., Inc. v. Comm'r of Labor,*
No. PR-82-85 (Industrial Board of App. Dec. 23, 1987)........................................27

*Turner v. Millenium Park Joint Venture, LLC,*
767 F. Supp. 2d 951 (N.D. Ill. 2011) ....................................................22, 23

*Weinstock v. Columbia Univ.,*
224 F.3d 33 (2d Cir. 2000), *cert. denied*, 540 U.S. 811 (2003)................................14

**STATUTES**

29 U.S.C. § 203................................................................................21

29 U.S.C. § 255................................................................................25

N.Y. Lab. Law § 198........................................................................20, 29, 30

N.Y. Lab. Law § 651...........................................................................20

N.Y. Lab. Law § 652.......................................................................5, 19, 20

N.Y. Lab. Law § 662...........................................................................29

**OTHER AUTHORITIES**

29 C.F.R. § 531.55...........................................................................6, 24

12 N.Y.C.R.R. §§ 137-1.5 ......................................................................20

12 N.Y.C.R.R. §146-2.14 .......................................................................28

Order of Commissioner of Labor M. Patricia Smith on the Report and Recommendations
for the 2009 Wage Board dated November 2009 ...............................................21

## TABLE OF AUTHORITIES
### (CONTINUED)

PAGE(S)

New York State Department of Labor Inter-Office Memorandum dated June 1, 1995 ...............24

N.Y. Dep't of Labor Op. RO-08-0060 (Apr. 22, 2009).........................................................10, 27

N.Y. Dep't of Labor Op. RO-09-0063 (Sept. 22, 2009).............................................................21

U.S. Dept. of Labor Opinion Letter FLSA 2008-18 ...........................................................10, 21

U.S. Dept. of Labor Opinion Letter FLSA 2009-12 ...................................................................23

Defendants Food Scope America, Inc., d/b/a Megu Tribeca, Masahiro Origuchi, Koichi Yokoyama and Salvatore Picardi, by their attorneys, Littler Mendelson, P.C., respectfully submit this memorandum of law in support of their motion for summary judgment pursuant to FRCP 56.

## I.    PRELIMINARY STATEMENT

This is an action under the Fair Labor Standards Act ("FLSA") and the New York State Labor Law ("NYLL") brought by seven individuals against their former employer, Foodscope New York LLC d/b/a Megu Tribeca, a Six Diamond sushi restaurant for alleged violations of federal and state minimum wage, overtime and tipping laws.[1]

Although the complaint alleges that Defendants altered time records to deprive Plaintiffs of minimum wages and overtime pay, the majority of Plaintiffs testified that that did not happen and that they were paid for all hours worked at the proper rate.  While some Plaintiffs claimed that their time was modified, they produced no records of such changes (though they allegedly once possessed them) and could not recall any specific occasion their hours were changed or the number of hours for which they allegedly were not paid.  Accordingly, summary judgment dismissing these counts must be granted.

Unable to demonstrate their original contention that they were not paid for all hours worked, Plaintiffs seize upon ambiguous technicalities in federal and state tipping rules to claim that Megu was not permitted to take a tip credit and, therefore, they are entitled to recover the difference between the federal minimum wage of $7.25 per hour and the tipped rate they were paid of $5.00 per hour.[2]  Under federal law, a tip credit may be taken against the minimum

---

[1]  The complaint incorrectly names Food Scope America, Inc. d/b/a Megu Tribeca.  Megu Tribeca is operated by Food Scope New York, LLC.  Food Scope America, Inc. is the sole member of Food Scope New York, LLC.

[2]  Although the precise hourly amount would be different at different times covered by this litigation due to variations in the federal and state minimum wage rates, generally federal law

wages of employees who receive tips, provided employees are not required to share tips with employees who do not regularly and customarily receive tips.  Plaintiffs – who worked as captains, bartenders, service bartenders, runners, servers or bussers and consented to participation in a restaurant-wide tip sharing arrangement – seek thousands of dollars from the restaurant because some tips were shared with (1) the sushi chef team who serve customers at the sushi bar and were the *sine qua non* of the restaurant experience; (2) one busser who's duties on some shifts included cleaning and restocking glassware and other items for use by fellow bussers; (3) one runner who's duties on some shifts included expediting food to fellow runners; and (4) event coordinators who did not even participate in the tip pool but received a portion of a mandatory service charge imposed on special events that they arranged and coordinated.

Defendants are entitled to summary judgment dismissing Plaintiffs' federal minimum wage claim because the undisputed evidence demonstrates that Megu's tip pool was entirely appropriate.  According to the United States Department of Labor ("DOL"), sushi chefs are among the types of employees that regularly and customarily receive tips.  (In fact, the DOL has reviewed Megu's tip pool participants and found no violation of law.)  Megu's runner/expeditors and busser/stockers are also permitted to share tips.  These positions not only interact with customers, but they also provide assistance that helps to serve customers better, increasing the overall tip pool.  Indeed, the very runner/expeditor whom Plaintiffs claim was improperly in the tip pool is a Plaintiff in the case claiming he is entitled to even more tips.  Plaintiffs' state

---

required a minimum wage of $7.25 per hour, comprised of $2.13 payment by the employer and $5.12 in tips whereas New York State required a minimum cash wage of $5.00 per hour. Therefore, the federal tip credit available to a New York restaurant equals $2.25 per hour. Plaintiffs claim entitlement to this hourly differential under federal and state minimum wage laws.

minimum wage claim fails because NYLL explicitly provides that improper sharing of tips does not affect the payment of minimum wages.

In addition to demanding minimum wages based on the payment of tips to the allegedly improper participants, Plaintiffs also demand payment of the actual tips.[3] Lastly, Plaintiffs assert a claim under NYLL 196-d, which statute prohibits an employer from taking any part of a gratuity received by an employee, but allows tip splitting among employees who perform *or assist in performing* personal service to patrons as a regular part of their duties. Megu's sushi chefs, runner/expeditors, busser/stockers and event coordinator fully satisfy this standard. Plaintiffs' "evidence" to the contrary is self-serving testimony that they did not see sushi chefs, busser/stockers and runner/expeditors typically interacting with customers, and since they did not see it, it must not have occurred. Such lack of "evidence" is not sufficient to create issues of material fact.

Even if the substantive claims could survive summary judgment, the claims against the individual Defendants should be dismissed. NYLL does not impose civil liability on individuals for wage violations. As such, all of the NYLL claims against the individual Defendants should be dismissed. Plaintiffs also cannot show that Masahiro Origuchi was anything more than an advisor to Megu and, therefore, all claims against him should be dismissed.

## II.   STATEMENT OF FACTS

### A.   The Restaurant and Working Hours

Megu Tribeca ("Megu") is an upscale sushi restaurant located in New York City's Tribeca area. (Declaration of Koichi Yokoyama dated July 1, 2013 ("Yokoyama Dec.") ¶ 2). In 2012, Megu was one of only two restaurants in the city to be awarded the Six Star Diamond

---

[3]   Clearly this would be a double recovery. If Plaintiffs are made whole by an award of allegedly improperly distributed tips, then the FLSA tip credit would be available.

Award from the American Academy of Hospitality Sciences.  (Yokoyama Dec. ¶ 2).  Megu customers are not just treated to good food; they are treated to a dining experience.  Megu's dining area is anchored by a large ice sculpture of Buddha.  (Yokoyama Dec. ¶ 3).  The other focal point of the dining area is the fourteen seat sushi bar located in the front of the room.  (Yokoyama Dec. ¶ 3).  To create an exceptional dining experience, Megu employs a team approach to servicing its customers.  While many restaurants provide service with just waiters and bussers, Megu's team approach includes a maître d, hosts, sommeliers, captains, servers, runners, bussers, bartenders, service bartenders and sushi bar chefs, to create an overall first class dining experience for the customer.  As part of the culinary experience, Megu offers guests 5-course, 7-course, and 9-course Tasting Menus.  (Yokoyama Dec. ¶ 5).

Megu is open for dinner seven days per week and typically provides service between 6 p.m. and 11 p.m.[4]  (Deposition of Salvatore Picardi 20:9-15).[5]  Megu employees record their working start and end times on the restaurant's Aloha computer system.  (Supplemental Declaration of Koichi Yokoyama dated August 14, 2013 ("Koichi Supp. Dec.") ¶ 3).  Megu uses this same Aloha system to maintain records of employee work hours.  (Koichi Supp. Dec. ¶ 4).  Each employee has an employee number and logs onto the system when he/she begins working

---

[4]  Initially Megu had a lunch shift, but it stopped serving lunch in 2006 or 2007.  (Deposition of Koichi Yokoyama 90:3-15).  Excerpts from the transcript of Defendant Koichi Yokoyama's April 18, 2013 deposition are attached as Exhibit "A" to the Declaration of Andrew Marks dated September 30, 2013 ("Marks Dec."), and are hereinafter cited as follows: "Yokoyama Dep. [Page(s): Line(s)]."

[5]  Excerpts from the transcript of Defendant Salvatore Picardi's May 2, 2013 deposition are attached as Exhibit "B" to Marks Dec., and are hereinafter cited as follows: "Picardi Dep. [Page(s): Line(s)]."

and logs off when he/she leaves work.  (Deposition of Odin Redd 28:3-7; [6] Deposition of Jason Schear 35:5-10).[7]  At the end of the workday, Megu employees would receive a receipt of the hours he/she worked that day and for the week.  (Deposition of Bareket Drori 25:3-26:1).[8]

Megu pays its servers, captains, bartenders, bussers and runners at the New York minimum wage for tipped food service workers pursuant to the applicable minimum wage orders.  (Yokoyama Dec. ¶ 8).  During the six years preceding the commencement of this action, that rate varied between $4.35 per hour in 2006 to the present $5.00 per hour.  N.Y. Lab. Law § 652(4).  During the six years preceding the commencement of this action, on the rare occasions when Plaintiffs worked in excess of 40 hours per week, they were paid overtime at time and one-half the then applicable minimum wage (*i.e.* $7.73 to $8.63).  (Marks Dec. Ex. F).

At all times material hereto,[9] Megu has had a tip sharing policy which combines all the tips received for the shift and distributes them among the service team on a point system.  (Picardi Dep. 29:22-30:3, 30:18-24; Yokoyama Dep. 76:5-12; Redd Dep. 62:3-14).  Servers and bartenders who collect and process most payments from guests – and consequently take possession of most tips left by guests – report the cash tips they receive on a cash out receipt.

---

[6]   Excerpts from the transcript of Plaintiff Odin Redd's February 27, 2013 deposition are attached as Exhibit "C" to Marks Dec., and are hereinafter cited as follows: "Redd Dep. [Page(s): Line(s)]."

[7]  Excerpts from the transcript of Plaintiff Jason Schear's March 18, 2013 deposition are attached as Exhibit "D" to Marks Dec., and are hereinafter cited as follows: "Schear Dep. [Page(s): Line(s)]."

[8]   Excerpts from the transcript of Plaintiff Bareket Drori's March 21, 2013 deposition are attached as Exhibit "E" to Marks Dec., and are hereinafter cited as follows: "Drori Dep. [Page(s): Line(s)]."

[9]   This action was commenced on January 24, 2012.  Claims brought under the New York Labor Law are subject to a six year statute of limitations.

(Yokoyama Dec. ¶ 11; Picardi Dep. 32:6-8). Cash tips are added to the charged tips as reported on Megu's Aloha computer system and totaled for the night. (*Id.*) The total tips received each night (less a percentage for credit card company charges on credit card tips) are divided by the sum of the points of all service team members working that night to determine the value of each point. Each service team member who worked is then given tips equal to the point value multiplied by his/her points. (Yokoyama Dep. 76:4-10). While the tip system at Megu has been tweaked a few times over the years, service team members included – captains, servers, runners (a subset of which works as an "expeditor"), bussers (including a busser who performs "stocker" duties), the sushi bar team, bartenders (including service bartenders), barbacks, sommeliers, hosts and a maître d. (Yokoyama Dep. 43:12-17; 43:25-44:12, 44:17-18; Picardi Dep. 30:18-24).[10] Tips are distributed together with wages through the payroll system. (Picardi Dep. 38:13-14).

**B.    The Defendants**

 **1.    Food Scope**

Food Scope New York, LLC operates Megu Tribeca. (Deposition of Masahiro Origuchi 13:14-15).[11] Food Scope America, Inc. ("FSA") is the sole member of Food Scope New York, LLC. (Origuchi Dep. 13:2-11).

From its inception until 2008, FSA was wholly owned by the Goodwill Group. (Origuchi Dep. 19:9-11). In or about 2008, the Goodwill Group was acquired by Cerberus Partners LP. (Origuchi Dep. 19:12-16). In 2010, FSA was sold to Mari Owada. (Origuchi Dep. 19:17-19).

---

[10]    The event coordinator did not participate in the tip pool. Rather, Megu added a mandatory "service charge" to private events. A service charge is not a gratuity under federal law. 29 C.F.R. § 531.55(a)

[11]    Excerpts from the transcript of Defendant Masahiro Origuchi's May 21, 2013 deposition are attached as Exhibit "G" to Marks Dec., and are hereinafter cited as follows: "Origuchi Dep. [Page(s): Line(s)]."

In or about October 2012, Ms. Owada sold FSA to Universal Entertainment Corporation, a publicly traded corporation. (Origuchi Dep. 19:20-22).

### 2. Masahiro Origuchi

In 2004, when the FSA opened Megu, Masahiro Origuchi lived in Japan and was the CEO and the largest shareholder of the Goodwill Group. (Origuchi Dep. 15:8-16:2). Megu was a tiny portion of the Goodwill Group and Origuchi was not directly involved in FSA or Megu's operations. (Origuchi Dep. 20:15-21:23). Origuchi moved to the United States in 2008 and was a senior advisor of Goodwill Group's U.S. operations, not including Megu. (Origuchi Dep. 18:6-17; 19:5). In or about 2010, Origuchi was made the chair of the FSA board, a position he holds today. (Origuchi Dep. 19:17-19, 24:17-19).

### 3. Koichi Yokoyama

In November 2003, Koichi Yokoyama was hired to work as a captain, but when the restaurant initially opened, he was appointed as an expeditor because most of the kitchen staff at the time of opening spoke only Japanese and Yokoyama was able to translate. (Yokoyama Dep. 12:3-23; 67:18-23). By August 2004, Yokoyama was working as a captain, participating in the tip pool at Megu. (Yokoyama Dep. 15:13; 43:12-17).

In 2006, another Megu restaurant was opened in midtown New York, and Yokoyama was hired to manage that facility. (Yokoyama Dep. 15:21-22; 20:11-12). In February 2008, he returned to work at Megu Tribeca, again serving as a captain. (Yokoyama Dep. 16:15-17:6).

In or about September 2009, Yokoyama became the Chief Operating Officer of FSA. In the beginning of 2010, Yokoyama became the President of FSA with responsibility for managing Megu Tribeca. (Yokoyama Dep. 17:7-22).

### 4. Salvatore Picardi

Salvatore Picardi began his employment with Food Scope New York, LLC in August 2007 as back of the house manager responsible for maintenance, repair, cleanliness, etc. (Picardi Dep. 10:3-9, 18-20, 21-25). As the back of house manager, he had no responsibility with respect to the Plaintiffs in this action or the purported class. (Picardi Dep. 10:21-25).

In 2009, Picardi became a front of the house manager. (Picardi Dep. 11:14-19). As front of the house manager, he was responsible for Plaintiffs' hiring, firing, training and scheduling. (Picardi Dep. 21:17-25, 22:17-19). During his employment with Megu, Picardi had very little involvement with Megu's payroll. (Picardi Dep. 24:18-24).

### C. Job Duties of Challenged Tip Pool Participants

### 1. Sushi Bar

Megu sushi chefs work behind a sushi bar, which is a glass counter displayed at the front of the main dining room visible to customers. (Yokoyama Dep. 54:16-21; Schear Dep. 91:1-6; Declaration of Kohki Usui ("Usui Dec.") ¶ 3). Sushi chefs create all sushi dishes at the sushi bar, in the view of Megu's customers. (Yokoyama Dep. 54:16-21; Usui Dec. ¶ 3). Approximately 40% of the restaurant's orders are for sushi. (Yokoyama Dep. 57:23-58:4). While creating sushi dishes, sushi chefs cut various different fish, displaying their knife skills. Sushi chefs also demonstrate their food preparation skills by rolling rice, seaweed and fish in a certain manner in the view of Megu's customers. (Yokoyama Supp. Dec. ¶ 8).

Megu's sushi bar has 14 seats where customers may sit and be served. (Yokoyama Dec. ¶ 3). Many customers, particularly those of Japanese national origin, request seating at the sushi bar so they can participate in the full sushi bar experience. (Yokoyama Dec. ¶ 14; Yokoyama Dep. 57:3-6; Usui Dec. ¶ 4). Sushi chefs discuss with such customers subjects relating to the creation of sushi, the origin on the fish being used, the particular cut the sushi chef is using, and

the unique dishes that may be available.  (Yokoyama Dec. ¶ 14; Deposition of Michael Martinez 45:4-10;[12] Usui Dec. ¶ 4).   Customers at the sushi bar are greeted by the sushi chef with a traditional greeting "irra shaimase" meaning welcome.  (Yokoyama Dep. 54:19-21; Usui Dec. ¶ 6; Deposition of Fai Lam 85:4-12).[13]  Customers sitting at the sushi bar may order food, drinks and dessert directly from the sushi chefs or they can order it from the servers assigned to the sushi bar.  (Yokoyama Dep. 159:10-13; Usui Dec. ¶¶ 6-7).  Sushi chefs serve customers sitting at the sushi bar by reaching over the glass counter and placing prepared sushi dishes on the customer's plate.  (Yokoyama Dep. 156:19-157:3, 157:11-14; Picardi Dep. 40:8-19; Usui Dec. ¶ 7; Martinez Dep. 44:22-24).   Sushi chefs will also serve complimentary items, referred to as "amuse bouche," to customers sitting at the sushi bar.  (Usui Dec. ¶ 6; Martinez Dep. 44:11-16; Yokoyama Supp. Dec. ¶ 9).  To avoid any miscommunication about what has been ordered and served at the sushi bar, it is the practice at Megu for sushi chefs to review the bill before it is presented to the customer.  (Usui Dec. ¶ 8).

At times, sushi chefs at Megu may also interact with customers sitting at tables.  (Usui Dec. ¶ 9).  For example, customers sitting at tables have come up to the sushi bar and thanked sushi chefs.  (Id. ¶ 9).  Some customers have even asked to take pictures with sushi chefs.  (Usui Dec. ¶ 11).

Sushi chefs occasionally receive cash tips directly from guests.   (Usui Dec. ¶ 11).  Because of the service provided and intended culinary experience, Megu treats sushi chefs as

---

[12]   Excerpts from the transcript of Plaintiff Michael Martinez's July 25, 2013 deposition are attached as Exhibit "H" to Marks Dec., and are hereinafter cited as follows: "Martinez Dep. [Page(s): Line(s)]."

[13]   Excerpts from the transcript of Opt-in Plaintiff Fai Lam's June 14, 2013 deposition are attached as Exhibit "I" to Marks Dec., and are hereinafter cited as follows: "Lam Dep. [Page(s): Line(s)]."

part of the service team.  (Usui Dec. ¶ 5; Yokoyama Dec. ¶ 4).  Sushi chefs dress in a shirt and tie (rather than a chef coat), participate in daily pre-shift meetings for the restaurant's direct service staff, and discuss dining planning with the service staff.  (Usui Dec. ¶ 11; Yokoyama Dec. ¶ 15; Yokoyama Dep. 65:22-66:16).

Other New York sushi restaurants include sushi chefs in their tip program.  (Yokoyama Dec. ¶ 15).  The federal and New York State labor departments have approved the inclusion of sushi bar chefs in a tip pool.  (See, U.S. Dept. of Labor Opinion Letter FLSA 2008-18 (Marks Dec. Ex. J); N.Y. Dept. of Labor Op. RO-08-0060 (Marks Dec. Ex. K).  Additionally, the general public considers sushi chefs as deserving of a gratuity and a participant in a tip pool.  (See, http://www.ask.com/answers/3900841/is-it-customary-to-tip-a-sushi-chef-when-he-prepares-a-special-dish-for-you ("A sushi chef is generally part of the tip pool, so he or she will get [part] of the tip you leave after your meal."  "It is customary to tip a Sushi chef.  If you also have a waitress you should tip them both.  The chef will remember the tip and will treat you very good if you go back to the restaurant.") (Marks Dec. Ex. L)).

### 2.      Busser/Stocker

Megu employs bussers who are responsible for taking dirty dishes, glasses, and silverware back to the kitchen and ensuring that there are no items on the side stations that need to be bussed.  (Yokoyama Dec. ¶ 16; Yokoyama Dep. 52:22-53:6).  At times, one of the bussers is assigned to the position of "stocker."  (Deposition of Malik Muhammad 80:21-24, 81:1-6;[14] Picardi Dep. 55:7-18, 56:9-57:14; Yokoyama Dep. 43:25-44:12; Martinez Dep. 37:4-11).  The assignment of the busser to the "stocker" position is rotated among all of the bussers and is

---

[14]  Excerpts from the transcript of Opt-in Plaintiff Malik Muhammad's May 3, 2013 deposition are attached as Exhibit "M" to Marks Dec., and are hereinafter cited as follows: "Muhammad Dep. [Page(s): Line(s)]."

chosen by the bussers themselves.  (Muhammad Dep. 80:21-24, 81:1-6; Picardi Dep. 55:7-18, 56:9-57:14; Yokoyama Dep. 43:25-44:12; Deposition of Evaristo Zenteno 46:1-47:4).[15]

During a shift, the busser assigned to the "stocker" position is responsible for ensuring that side stations are adequately stocked with clean dishes and silverware.  (Yokoyama Dec. ¶ 16; Yokoyama Dep. 52:22-53:6; Lam Dep. 78:1-22).  Additionally, the busser assigned to the "stocker" position performs the traditional busser duties of taking dirty dishes, glasses, and silverware back to the kitchen and ensuring that there are no items on the side stations that need to be bussed.  (Zenteno Dep. 47:5-18, 68:3-8; Yokoyama Dec. ¶ 16; Yokoyama Dep. 52:22-53:6).  The busser assigned to the "stocker" position for the shift is essentially a busser with one additional duty.  (Zenteno Dep. 46:12-15).

### 3.    Runner/Expeditor

Megu employs runners who are responsible for delivering food from the kitchen to the customer's table and ensuring that the right food is brought to the right guest.  (Yokoyama Supp. Dec. ¶ 11).  During peak periods of food service, *i.e.*, 8:00 to 10:00 p.m., an experienced runner will work as "expeditor" assisting the runners to make sure their orders are correct, plated properly, at the right temperature and distributed in the correct sequence.  (Yokoyama Dec. ¶ 18).  Ensuring that orders are correct, plated properly, at the right temperature and distributed in the correct sequence are critical steps to enhancing the service to the customer and consequently the amount of the tip.  (Yokoyama Dec. ¶ 18).  Notwithstanding the additional responsibilities, a runner/expeditor's primary duty is the same as a runner's – making sure the right food is brought to the right guest at the right time.  (Yokoyama Dec. ¶ 20; Picardi Dep. 48:6-15).

---

[15]  Excerpts from the transcript of Opt-in Plaintiff Evaristo Zenteno's July 25, 2013 deposition are attached as Exhibit "N" to Marks Dec., and are hereinafter cited as follows: "Zenteno Dep. [Page(s): Line(s)]."

On days in which Megu's senior runner was not working, the runner/expeditor duties were rotated among the runners.  (Deposition of Dana Beierle 23:2-10;[16] Drori Dep. 76:8-11; Deposition of Alfredo Galvan 28:15-23;[17]  Muhammad Dep. 79:3-20).  Runners would also fill in for the runner/expeditor when the runner/expeditor took a break during a shift.  (Deposition of Armando Anguiano 37:20-38:2).[18]  At times, runners would also assist with garnishing plates. (Anguiano Dep. 56:10-12, 56:22-57:5).

Megu's runner/expeditor attended the pre-shift meetings along with the rest of the runners.  (Anguiano Dep. 34:4-14).  Megu's runner/expeditor also wore the same uniform as Megu's runners and did not wear a chef's hat.  (Picardi Dep. 48:16-49:4, 49:23-50:5; Anguiano Dep. 57:6-9).

Between 2008 and December 2009, the runner/expeditor participated in Megu's tip pool. (Yokoyama Dec. ¶ 21; Anguiano Dep. 68:7-18; Declaration of Armando Anguiano dated June 19, 2013, ¶ 9 (Marks Dec. Ex. AH)).[19]

---

[16]   Excerpts from the transcript of Plaintiff Dana Beierle's March 21, 2013 deposition are attached as Exhibit "O" to Marks Dec., and are hereinafter cited as follows: "Beierle Dep. [Page(s): Line(s)]."

[17]   Excerpts from the transcript of Opt-in Plaintiff Alfredo Galvan's May 3, 2013 deposition are attached as Exhibit "P" to Marks Dec., and are hereinafter cited as follows: "Galvan Dep. [Page(s): Line(s)]."

[18]   Excerpts from the transcript of Opt-in Plaintiff Armando Anguiano's August 1, 2013 deposition are attached as Exhibit "Q" to Marks Dec., and are hereinafter cited as follows: "Anguiano Dep. [Page(s): Line(s)]."

[19]   As discussed in detail below, absent a willful violation (which Plaintiffs cannot demonstrate), Plaintiffs' claims with respect to the impropriety of the inclusion of the expeditor in the tip pool are untimely as Plaintiffs commenced this action on January 24, 2012, more than two years after the expeditor was removed from the tip pool.

### 4.      Event Coordinators.

In addition to daily dining service, Megu hosts private parties. (Picardi Dep. 57:15-16). To facilitate hosting these private parties, Megu employs event coordinators. The event coordinator books the private parties at Megu, working with the party host to plan the menu, arrange for decorative or presentation requirements, and meet other special needs. (Yokoyama Dec. ¶ 22; Picardi Dep. 58:5-9). The event coordinator serves as Megu's contact person for the host of private parties. (Yokoyama Dec. ¶ 22).

During events, event coordinators greeted guests. (Schear Dep. 81:19-22). The event coordinator would also interact with the host, throughout the party, helping the host order wines and food, ensuring that orders are delivered to the right people, and making certain the check is correct. (Picardi Dep. 58:5-23; Lam Dep. 105:4-22). When the event coordinator attends the event and works with the host, the event coordinator receives a portion of the service charge assessed for that event. (Yokoyama Dec. ¶ 23). The event coordinator does not participate in the tip pool and is not given a share of the tips from the tip pool. (Yokoyama Dep. 44:19-23, 47:13-14, 74:9-22; Yokoyama Dec. ¶ 23).

### D.      <u>United States Department of Labor Reviews and Approves Megu Tip Pool</u>

In 2004, one or more of Megu's servers complained to the United States Department of Labor about their overtime rate of pay and the propriety of Megu's tip pool which in turn sparked a DOL investigation. (Yokoyama Dec. ¶ 24). During the DOL investigation, the DOL requested that Megu explain the restaurant's tip pool arrangement. (Marks Dec. Ex. R, p. 5). Megu explained to the DOL that the tip pool included <u>bussers, runners,</u> servers, captains, <u>sushi chefs,</u> baristas, bartenders and barbacks. (*Id.*) (emphasis added). Megu also explained that event planners received <u>a percentage of the service charge</u> on bookings they made. (*Id.*) (emphasis

added).  Megu also provided sample tip pool sheets and Megu's tip policy for the DOL's review.  (*Id.*, pp. 6-13).

At the conclusion of its investigation in 2005, the DOL informed Megu that it had determined that Megu incorrectly calculated overtime at 1.5 times the New York State minimum wage for tipped employees, rather than 1.5 times the federal minimum wage minus the federal tip credit.  (Yokoyama Dec. ¶ 25; Marks Dec. Ex. S, pp. 2-3).  The DOL did not find anything improper with Megu's tip pool or that Megu could not avail itself of the tip credit.  (Yokoyama Dec. ¶ 25; Marks Dec. Ex. S).

### E.     Prior Litigation Regarding Megu Tip Pool Gains No Traction

In 2005, three former Megu servers commenced an action in this court, also complaining about the participants in Megu's tip pool, including the sushi chefs (05-cv-2617 (NRB)).  (Marks Dec. Ex. ¶ 2).  In that action, several servers submitted declarations affirming that sushi chefs served guests and were appropriately included in the tip pool.  (*See* Marks Dec. Ex. T).

## III.     ARGUMENT

### A.     Standard of Review

Summary judgment is appropriate where the pleadings, discovery and disclosure materials on file, and any affidavits, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), *cert. denied*, 540 U.S. 811 (2003).  Such relief should be granted where a party cannot "make a showing sufficient to establish the existence of an element essential to [her] case and on which [she] will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Parker v. Sony Pictures Entertainment, Inc.*, 260 F.3d 100, 111 (2d Cir. 2001) ("[a] defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial.").

When the Defendants point to an absence of evidence regarding an essential element of Plaintiffs' claims, Plaintiffs must "show the presence of a genuine issue by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [their] favor, to establish the existence of that element at trial." *Grain Traders v. Citibank, N.A.*, 160 F.3d 97, 100 (2d Cir. 1998). Only "hard evidence," rather than speculation or conclusory statements, is sufficient, as a matter of law, to defeat a properly supported motion for summary judgment. *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), *cert. denied*, 524 U.S. 911 (1998). The relevant question is whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Here, there is a complete absence of evidence showing that any of the Plaintiffs worked overtime for which they were not properly compensated. With respect to the alleged impropriety of the tip sharing, there is no evidence that the event coordinator participated in the tip pool, and no reasonable jury could conclude that the sushi chef, runner/expeditor and busser/stocker were not entitled to a share of the tips. Even if Plaintiffs are able to raise a factual dispute requiring trial regarding tip pool participants, the claims against the individual defendants must be dismissed because there is no individual liability for tips under state law and, because the individuals are not employers under the FLSA.

Accordingly, Defendants are entitled to summary judgment in whole or in part.

**B.    There is no Admissible Evidence that Plaintiffs were Denied Overtime Pay**

The second and fourth counts of the complaint allege that Plaintiffs were denied overtime pay in violation of federal and state law. Megu maintained records of employee work hours by having employees record their starting and quitting times on the Aloha system. Megu payroll records show that employees were paid for all hours reflected on that system and received overtime pay for hours worked in excess of forty. (Koichi Supp. Dec. ¶¶ 3-6). Summary

judgment dismissing Plaintiffs' overtime claims should be granted because Plaintiffs either conceded that they were paid for all hours worked or could not produce any admissible evidence to support the conclusory allegation that they were not.

An employee who claims unpaid overtime or minimum wages under the FLSA has the burden of proving that he performed work for which he was not properly compensated and that the employer had actual or constructive knowledge of that work. *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352, 361 (2d Cir. 2011). Recent Second Circuit cases further establish a plaintiff's burden to state a viable FLSA overtime claim. *See Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013) (finding plaintiff did not state a plausible FLSA overtime claim because he did not allege 40 hours of work in a given workweek and uncompensated time in excess of the 40 hours); *Nakahata v. New York-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192 (2d Cir. 2013) (same); *DeJesus v. HF Mgmt. Servs., LLC*, 2013 U.S. App. LEXIS 16105, at *11 (2d Cir. Aug. 5, 2013) (finding plaintiffs' allegations that "in some or all weeks she worked more than forty hours a week without being paid 1.5 times her rate of compensation" was insufficient to state an FLSA claim). In *Lundy,* the plaintiffs alleged that they usually worked less than 40 hours during some weeks and "occasionally" or "approximately twice a month" worked more than 40 hours. *Lundy*, 711 F.3d at 114-15. These vague allegations were insufficient to state a viable overtime claim, and the court affirmed dismissal of the plaintiffs' overtime claims.

Here, many of the Plaintiffs admitted that they were paid for all hours they worked. These Plaintiffs testified:

| Bareket Drori | "Q. Do you recall any week where you worked in excess of 40 hours and were not paid overtime? A. I don't recall."  (Drori Dep. 47:14-19) |
|---|---|

| | |
|---|---|
| | "I was usually scheduled to work three or four shifts a week." "My shifts lasted from approximately 5 p.m. until midnight every shift." (Declaration of Bareket Drori dated September 9, 2013, ¶¶ 3-4 (Marks Dec. Ex. U)). |
| Dana Beierle | "Q. Was there any week at Megu, while you were employed there, that you worked in excess of 40 hours a week? A. No." (Beierle Dep. 7:13-16) |
| Odin Redd | "Q. Are there any times that you're aware of that someone adjusted your punch in and out time to reflect less than you had punched in and out for? A. For me specifically, no." (Redd Dep. 41:6-9)<br><br>"Q. When you worked more than 40 hours a week, did you receive overtime pay? A. I believe so, yeah. Uh-hum." (Redd Dep. 44:2-4). |
| Marvin Charles | Q. "Do you recall any instance where you weren't paid overtime?" A. "No." (Deposition of Marvin Charles Dep. 25:11-13).[20] |
| Alfredo Galvin | "Q. Do you have any specific recollection of any week where you worked overtime but were not paid. A. No, I don't." (Galvin Dep. 19:3-6) |
| Malik Muhammad | "Q. And for changing of overtime hours, did that ever happen to you? A. Not specifically..." (Muhammad Dep. 10:10-12).<br><br>"I know that I was paid overtime, but I don't - - I don't think that I was paid the correct amount of overtime. But I have no proof, because I didn't really keep track of the hours that I worked." (Muhammad Dep. 29:10-14). |

Because these Plaintiffs all acknowledge that they were not denied overtime pay, summary judgment should be granted to Defendants on their Second and Fourth Claims for Relief.[21]

Other Plaintiffs testified that they were not paid for all overtime that they worked. These Plaintiffs, however, cannot meet their burden to show they are entitled to overtime. Employees making such a claim must "produce[] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Kuebel*, 643 F.3d at 361. While it is possible

---

[20] Excerpts from the transcript of Opt-in Plaintiff Marvin Charles' May 6, 2013 deposition are attached as Exhibit "V" to Marks Dec., and are hereinafter cited as follows: "Charles Dep. [Page(s): Line(s)]."

[21] Opt-in Plaintiffs Fai Lam and Aureliano Ramirez Riego stopped working for Megu over four years prior to joining the lawsuit. Summary judgment should be granted for all of Lam's and Riego's federal claims as untimely.

for an employee to meet his burden through estimates based on his own recollection, *Id.* at 362, the Plaintiffs could not offer any admissible evidence to meet their burden of proof.  Plaintiffs gave the following testimony:

| Jason Schear | "Q. So sitting here today, can you identify for me any work week that you worked in excess of 40 hours but were not paid proper overtime?  A. I don't understand what you mean.  Specific date?  Q. Yeah.  Well, it would be by week, so, you know -- A.  I can't give you a specific week..." (Schear Dep. 50:12-19). <br><br> "Q. Can you approximate for me the number of hour for which you worked overtime that you believe you were not paid?  A.  Approximate?  I don't know.  90 to a hundred and something.  Maybe." (Schear Dep. 73:14-18). |
|---|---|
| Blake Skipper | "I never worked overtime." (Deposition of Blake Skipper 18:11).[22] |
| Evaristo Zenteno | "Q. Can you tell me when you worked overtime but were not paid for it?  A.  I worked many days, on Sundays and other days also for someone else, but I don't remember what days.  Q.  Okay.  So you can't tell me what days you worked overtime but were not paid for it?  A.  No.  Because like I said, they changed the schedule all the time." (Zenteno Dep. 53:19-54:3). <br><br> "Q. Is there any document that would refresh your recollection as to when you worked overtime?  A. None." (Zenteno Dep. 59:5-7). |
| Michael Martinez | "Q. Can you tell me when you worked overtime and weren't paid for it?  A. No.  Q.  Is there anything that would refresh your recollection as to when you worked overtime and weren't paid for it?  A. No." (Martinez Dep. 35:8-14). |

Moreover, while each of these Plaintiffs testified that they each had records showing every overtime hour they claim to have worked, they did not retain any of these records. (*See* Schear Dep. 49:7-10, "Q. So you would have had possession, at some point in time, of a record of every week where you worked in excess of 40 hours; right?  A. Yes;" Zenteno Dep. 51:1-7, "Q. And you received one of these clock-out reports every time that you punched out; correct?  A. Yes . . .  Q. Okay.  Did you keep any of these documents?  A. No;" Martinez Dep. 34:6-9, "Q.

---

[22]  Excerpts from the transcript of Opt-in Plaintiff Blake Skipper's June 12, 2013 deposition are attached as Exhibit "W" to Marks Dec., and are hereinafter cited as follows: "Skipper Dep. [Page(s): Line(s)]."

Did you keep any of these documents?  A. I don't have any, no.  I kept them for a while, and I moved so many times.  They have been lost or thrown out.").

Because Plaintiffs were either paid for the overtime they worked or cannot present any admissible evidence that would be sufficient for a jury to justifiably and reasonably infer that they are owed overtime pay, summary judgment should be granted to Defendants on Plaintiffs' Second and Fourth Claims for Relief.

C.     **Megu Fully Complied with New York Minimum Wage Law**

Plaintiffs' Third Claim for Relief alleges that Defendants violated New York State minimum wage act, NYLL § 650 et seq., by failing to pay minimum wage for all hours worked. (Cplt. ¶¶ 48-49).  There is no evidence to support such a claim.

The hourly cash wage required in New York for food service workers was $4.35 in 2006; $4.60 from 2007 to July 24, 2009; $4.65 from July 25, 2009 to 2011; and $5.00 since 2011, provided that the tips received by such workers when added to the cash wage equal or exceed the state minimum wage. N.Y. Lab. Law § 652(4).  The statute defines food service worker as "any employee primarily engaged in the serving of food or beverages to guests ... including but not limited to wait staff, bartenders, captains and bussing personnel.  As discussed above, all Plaintiffs served as servers, captains, bartenders, bussers and runners.  Defendants' payroll records demonstrate that at all times relevant to this action, the cash wages paid to Plaintiffs were at least the minimum required by state law.[23]

---

[23] As detailed above, some of the Plaintiffs allege time shaving of overtime hours but there is no admissible evidence of time shaving beyond self-serving statements contradicted by Defendants' records.  Moreover, Plaintiffs' arguments should be rejected by a spoliation direction given that all Plaintiffs had, but no longer possess, records demonstrating all of their alleged hours worked and the hours Defendants allegedly shaved.

Plaintiffs allege that Megu "was not entitled to reduce the minimum wage by applying the tip credit allowance [under state law] because defendants required the plaintiffs to share their tips with non-service employees...." (Cplt. ¶ 35). This claim misapplies New York law. In contrast to the FLSA, which allows an employer to count tips received by an employee as wages for purposes of the minimum wage against federal minimum wage, New York State law establishes a separate lower minimum wage for "food service workers" who receive tips. *See* N.Y. Lab. Law § 652(4); 12 N.Y.C.R.R. §§ 137-1.5; 146-1.3. This reduced wage rate is not a "tip credit." Megu satisfied the New York statutory minimum wage.

Nothing in the Minimum Wage Act – Article 19 of the Labor Law – precludes an employer from retaining tips in excess of that necessary to satisfy the minimum wage obligation. Indeed, such excess tips are not wages. [24] To be sure, N.Y. Labor Law § 196-d prevents an employer from accepting any part of the gratuities received by an employee, and the complaint's Fifth Claim for Relief purports to assert such a claim. But compliance with N.Y. Labor Law §196-d has no impact on the minimum wage law. Of this there can be no confusion as § 196-d expressly states: "Nothing in this subdivision shall be construed as affecting the allowances from the minimum wage for gratuities in the amount determined in accordance with the provisions of article nineteen of this chapter." Based on this language, New York's Department of Labor has opined: "[A] violation of Section 196-d does not prevent an employer from paying a restaurant server the food service worker minimum wage. Therefore ... the employer would not be required, under the New York State Labor Law, to reimburse an employee for the difference

---

[24]   New York Minimum Wage Act defines "wage" to include "allowances, in the amount determined in accordance with the provisions of this article, for gratuities ...." N.Y. Lab. Law § 651(7). *A fortiori*, gratuities in excess of the amount of the allowance under the Act are not wages and an action for violation of New York Labor Law 196-d is not a "wage claim" under of New York Labor Law 198 for which attorneys' fees and liquidated damages may be awarded.

between the minimum wage and the food service worker minimum wage ...." (N.Y. Dep't of Labor Op. RO-09-0063 (Sept. 22, 2009)).[25]

Plaintiffs' effort to conglomerate separate and distinct articles of the New York Labor Law to craft a limitation that the statute expressly declines to impose must be summarily rejected and summary judgment should be granted dismissing Plaintiffs' Third Claim for Relief.

**D.    The First Claims for Relief Should be Dismissed in Whole or in Part Because Megu's Tip Pool was Compliant with the FLSA and/or the Claims of Some Plaintiffs are Barred by the Statute of Limitations**

### 1.    Megu's Tip Pool was FLSA Compliant

Plaintiffs' First Claim for Relief alleges that Defendants violated federal minimum wage law by improperly taking a tip credit.  Under the FLSA, an employer may not avail itself of the tip credit if it requires employees to share their tips with employees who do not regularly and customarily receive tips.  29 U.S.C. § 203(m); *Shahriar v. Smith & Wollensky Rest. Grp, Inc.*, 659 F.3d 234, 240 n. 5 (2d Cir. 2011).

Sushi chefs working at a sushi bar are the types of employees who regularly and customarily receive tips and, therefore, may be included in the tip pool.  U.S. Dep't of Labor Opinion Letter FLSA 2008-18 (Dec. 19, 2008) (Marks Dec. Ex. J)("Itamae-sushi chefs prepare and serve sushi to customers in the bar area.... Servers assist itamae-sushi ... chefs by taking orders of meals and drinks, and bussers remove plates and serve water.... It has been our longstanding position that counter persons who serve customers may participate in tip pools. Itamae-sushi ... chefs provide customer service similar to counter persons..... Therefore it is our opinion that itamae-sushi ... chefs may also participate in tip pooling.")  Indeed, the United

---

[25] In 2009, the New York State Department of Labor adopted new regulations for the hospitality industry, which includes restaurants.  In her report, the Commissioner of Labor stated:  "I reject the recommendation to penalize employers for violations relating to tip pooling with the loss of the tip allowance for the period of the violation." (Marks Dec. Ex. AG, ¶ C)

States Department of Labor found no issues with the inclusion of sushi chefs in Megu's tip pool. (*Id.*). Further, the general public considers sushi chefs as deserving of a gratuity and a participant in a tip pool. (*See*, http://www.ask.com/answers/3900841/is-it-customary-to-tip-a-sushi-chef-when-he-prepares-a-special-dish-for-you ("A sushi chef is generally part of the tip pool, so he or she will get [part] of the tip you leave after your meal." "It is customary to tip a Sushi chef. If you also have a waitress you should tip them both. The chef will remember the tip and will treat you very good if you go back to the restaurant.") (Marks Dec. Ex. L)). In fact, Megu sushi chefs directly receive tips from guests.

While Plaintiffs may argue that the sushi chefs "primary duty" is to make sushi, even if true, this does not counter that sushi chefs play a prominent role in enhancing the customer experience at Megu. Moreover, it is undisputed that sushi chefs had at least some interaction with customers, which coupled with the sushi chefs' enhancement of the customer experience, is sufficient to establish they are FLSA tip employees eligible to participate in the Megu's tip pool. *See Stewart v. CUS Nashville, LLC*, 2013 U.S. Dist. LEXIS 111802, at *45-46 (M.D. Tenn. Aug. 8, 2013) (finding that security guards who had played a prominent role in enhancing the employers customer experience and who have some interaction with customers were tipped employees eligible to participate in the employer's tip pool).

Megu's runner/expeditor and busser/stocker were also properly part of the tip pool. Direct communication or contact with the guests is not a requirement for tip eligibility; bussers and service bartenders have little or no customer contact, yet may be lawfully included in a tip pool. Rather, it is appropriate to analyze the duties as to whether such persons "help to serve customers better and more fully and thus obtain additional tips and enhance the pot for everyone." *Turner v. Millennium Park Joint Venture, LLC*, 767 F. Supp. 2d 951, 954-55 (N.D.

Ill. 2011)("[I]n real world terms it is readily understandable that employees receiving tips directly from customers may agree to share tips when they believe that the employees with whom they share help them to serve the customers better and more fully and thus to obtain additional tips and sweeten the pot for everyone.")

The expeditor function at Megu assuredly assists the runners and servers with customer service.  Indeed, when an expeditor is not scheduled, the duties are performed directly by the runners.  Relieving runners of the duty of making sure the food is properly plated by the chefs or adding required garnishes expedites the runners in delivery.  Accordingly, the expeditor function is properly a tipped position.  *See, Giuffre v. Marys Lake Lodge, LLC*, 2012 U.S. Dist. LEXIS 140506, at *7-12 (D. Colo. Sept. 28, 2012) (expeditor was properly included in the tip pool because it was a front of the house position filled by a runner who wore a uniform similar to that of a runner).  Similarly, the stocker duties at Megu fall squarely within the job of a busser.  In fact, the job is rotated among the bussers.  Bussers performing stocking duties will also perform the traditional busser duties (*e.g.*, taking dirty dishes, glasses, and silverware back to the kitchen and ensuring that there are no items on the side stations that need to be bussed) during the same shift.  Thus the busser/stocker is appropriately within the tip pool.  *See, Turner*, *supra,* (silverware roller hired to relieve servers of duties they would otherwise perform are properly included in tip pool); U.S. Dept. of Labor Opinion Letter FLSA 2009-12 (Jan. 15, 2009) (barback responsible for stocking bar and assuring area remains clean properly included in tip pool.) (Marks Dec. Ex. Y).

Megu's event coordinators do not participate in the tip pool.  Megu adds a mandatory service charge to event contracts and, for a period of time, gave the event coordinator a portion of that service charge.  (*See* Declaration of Alfredo Galvan dated September 4, 2013, ¶ 32

(Marks Dec. Ex. Z)).  A mandatory service charge is not a gratuity under the FLSA.  29 C.F.R. §

531.55 (2012) ("A compulsory charge for service, such as 15 percent of the amount of the bill,

imposed on a customer by an employer's establishment, is not a tip.").  In any event, because a

portion of the service charge was given directly to the event coordinator directly, such monies

never became part of the tip pool, and no portion of the tip pool monies were given to the event

coordinator.  *See*, *Arencibia v. 2401 Rest. Corp.*, 831 F. Supp. 2d 164, 177 (D. D.C. 2011).[26]

    As detailed above, the fact that Megu's tip pool is FLSA compliant is further supported

by the DOL's review of Megu's tip pool years before the commencement of this lawsuit.  The

---

[26]  Prior to March 1, 2011, a mandatory service charge was not a gratuity under New York Labor
Law § 196-d unless the employer led the patron to believe that it was, in fact, a gratuity.
NYSDOL Inter-Office Memorandum, June 1, 1995 ("[e]ffective immediately, service charges
will not be considered gratuities," and "[a] service charge is not required to be distributed to
employees.") (Marks Dec. Ex. AI).  In such a case, and only in such a case, the full amount of
the fixed charge was required to be paid out to the service employees.  N.Y. Dep't of Labor
Response to Request for Opinion, (March 26, 1999) (Marks Dec. Ex. AA).  That NYSDOL
standard – that a mandatory service charge did not purport to be a gratuity unless it was
represented as such to the customer – remained in effect until March 1, 2011, when the
NYSDOL began enforcing new wage orders applicable to the hospitality industry, imposing the
opposite, "rebuttable presumption that . . . any charge for 'service' or 'food service' is a charge
purported to be a gratuity."  N.Y.C.R.R. 146-2.18(b).

Under current regulations, a service charge is presumed to be a gratuity within the meaning of
New York Labor Law § 196-d.  If so, the service charge cannot be retained by the employer but
must be distributed to employees.  An event planner is often an intended recipient of a service
charge paid by the event host, particularly where the event planner assists with the menu
planning, decorations or other equipment needs, and/or is present during the event to greet the
guests and solve problems.  *Arencibia*, 831 F. Supp. 2d at 178 (to qualify for tips, employee who
sells events for restaurant need not greet or serve food to guests because "her direct interaction
with customers in arranging and planning private parties is sufficient."); *Garcia v. La Revise
Assocs., LLC*, 2011 U.S. Dist. Lexis 3325, at * 19-20 (S.D.N.Y Jan. 13, 2011) (banquet
coordinator properly included in tip pool where she dealt directly with private party hosts in
advance of events for planning purposes and worked directly with hosts during event to ensure
their satisfaction.).  While Plaintiffs may claim that the event coordinator received a portion of
the service charge even when they did not appear at the event, such a determination must be
made on an event by event basis and the claim is available only to employees who worked that
event and were deprived of the service charge attributable to that event.  Plaintiffs here do not
identify any events that they worked.

DOL never opined that Megu's tip pool was improper and instead noted that while Megu was paying overtime, it had done so at the 1.5 times the New York State minimum wage for tipped employees, rather than 1.5 times the federal minimum wage minus the federal <u>tip credit</u>. If the DOL believed Megu's tip pool was improper, it would have notified Megu, sought damages for unpaid minimum wages and determined that Megu would not have been able to pay overtime at 1.5 times the federal minimum wage minus a tip credit.

Because Megu's tip pool was compliant with the FSLA, Megu was entitled to take a tip credit against the federal minimum wage and Plaintiffs' First Claim for Relief should be dismissed.

### 2.     Plaintiffs' FLSA Claims are Barred by the Statute of Limitations

Even if the court were to find that a disputed material fact precludes summary disposition as to all Plaintiffs, the claims of several Plaintiffs are barred by the statute of limitations. The FLSA's statute of limitation is 2 years, and can be enlarged to up to three years for willful violations. *See* 29 U.S.C. § 255(a); *Clarke v. JPMorgan Chase Bank, N.A.*, 2010 U.S. Dist. LEXIS 33264, at *25-29 (S.D.N.Y. Mar. 26, 2010) (finding FLSA claims time-barred); *Abdrabo v. New York - Worker Comp. Bd.*, 2005 U.S. Dist. LEXIS 10317, at *5-6 (S.D.N.Y. May 27, 2005) (dismissing FLSA claims as time-barred where former employee filed FLSA claims nearly five years after employment ended).[27] Plaintiff Fai Lam joined this case on July 13, 2012, over three years after his employment ended with Megu.  (*See* Lam Dep. 110:3-5; Marks Dec. Ex. AC).  Plaintiff Aureliano Ramirez Riego joined this case on June 11, 2012, over three years after

---

[27]  At a minimum, Megu's reliance on the DOL's findings and determinations support a finding that Megu's conduct was not willful and that the statute of limitations should be limited to two years.  "'An employer willfully violates the FLSA when it either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the Act.'"  *Edwards v. The City of N.Y.*, 2011 U.S. Dist. LEXIS 97134, at*14 (S.D.N.Y. Aug. 26, 2011).  Megu's reliance on the DOL's determination that its tip pool was proper refutes any claim that Megu "knew or showed reckless disregard."

his employment ended with Megu.  (*See* Marks Dec. Exs. AE and AF).  Because both of these Plaintiffs' claims are barred by the statute of limitations, Megu is entitled to summary judgment on their First and Second Claims for Relief.

**E.**     **The Fifth Claim for Relief Should be Dismissed Because Megu's Tip Pool Was Compliant with New York State Law**

Plaintiffs' Fifth Claim for Relief alleges that Defendants violated New York Labor Law § 196-d by diverting a portion of Plaintiffs' tips to employees they contend are not eligible to participate in a tip pool.  (Cplt. ¶ 57).  Section 196-d is a tip misappropriation statute.  It provides: "No employer or his agent or an officer or agent of any corporation … shall demand or accept, directly or indirectly, any part of the gratuities, received by an employee, or retain any part of a gratuity or of any charge purported to be a gratuity for an employee."  The purpose of § 196-d was to end the deceptive practice of an employer retaining money paid by a patron under the impression that he was giving it to the employee and not the employer.  *Samiento v. World Yacht, Inc.*  10 N.Y.3d 70, 79 n.4, 883 N.E.2d 990, 994 n. 4 (2008).  Because neither Megu nor its agents or officers retained any of the tips left by customers, Plaintiffs claim for violation of Section 196-d should be dismissed.

Plaintiffs' effort to create a cause of action under Section 196-d based on who participates in tip sharing should be rejected.  Section 196-d expressly states that "[n]othing in this subdivision shall be construed as affecting ... the sharing of tips by a waiter with a busboy or similar employee."  Notwithstanding this plain language, the New York State Department of Labor has interpreted the exemption as a limitation, and has suggested that section 196-d does regulate tip sharing and limits sharing to employees who directly receive tips and those in positions similar to bussers.  The Second Circuit has so interpreted the statute.  *Shahriar, supra,* 659 F.3d at 240 (finding section 196-d "prohibits employers from requiring tipped employees to

share tips with non-service employees or managers.").[28]   But even under this standard, tip sharing among employees (not managers) is permissible unless the employees do not engage in any meaningful aspect of direct service to customers.  See *Barenboim v. Starbucks Corp.*, 2013 N.Y. LEXIS 1678, *17 (N.Y. June 26, 2013) (finding "an employee whose personal service to patrons is a principal or regular part of his or her duties may participate" in an employer mandated tip pool); *Shahriar, supra*,  659 F.3d at 240 citing *Tandor Rest., Inc. v. Comm'r of Labor,*  No. PR-82-85 (Industrial Board of App. Dec. 23, 1987).

With respect to sushi chefs, the New York State Department of Labor has opined that sushi chefs working at a sushi bar may participate in a tip pool even though they prepare sushi for the entire restaurant.  (N.Y. Dep't of Labor Op. RO-08-0060 (Apr. 22, 2009), Marks Dec. Ex. K) ("These chefs … act much like a 'flair bartender,' putting on a show for guests by demonstrating their knife skills and agility with the product…. [I]n many circumstances, the chefs directly communicate with guests, taking sushi orders as well as describing the menu and its components in detail, as well as being called upon to 'instruct' a guest on how to eat a particular course.  They also prepare the sushi in front of the guest.").

---

[28]  In *Barenboim v. Starbucks Corp.*, 2013 N.Y. LEXIS 1678 (N.Y. June 26, 2013), the New York Court of Appeals addressed the scope of Section 196-d in connection with an employee's ability to participate in a tip pool when the employee possessed some supervisory responsibilities.  While focusing on a "supervisor's" ability to participate in the tip pool, the court explained that in January 2011, the DOL codified it's "longstanding construction of section 196-d as limiting tip-pool eligibility to workers who 'perform, or assist in performing, personal service to patrons that is a principal and regular part of their duties and is not merely occasional or incidental." *Id.* at *12. (emphasis added).  The court ultimately concluded that "an employee whose personal service to patrons is a principal or regular part of his or her duties may participate" in an employer mandated tip pool.  *Id.* at *17.  Because the court found that supervisors performed personal service to patrons, it addressed the types of positions that "assist in performing" personal service.

As discussed above, the runner/expeditor and stocker/busser are employees similar to busboys and service bartenders, and assist in providing personal service to guests. The stocker position is merely a subset of the busser job title. Indeed, stockers wear the same style of clothing as busboys. The individuals in the stocker position rotate, and when they are not acting as stockers, they are busboys. Stockers are responsible for ensuring that the side stations on the floor of the restaurant are properly stocked with clean dishes, glasses, and silverware, so the tables can be promptly re-set between seatings.[29] The expeditor duties are performed by runners. Relieving runners of the duty of making sure the food is properly plated by the chefs or adding required garnishes expedites the runners in delivery. Runner/expeditors are not kitchen-based employees, and their primary duty is the provision of direct customer service. Moreover, "food runners" are listed in the new Minimum Wage Order as an occupation eligible to receive a distribution from a tip pool. *See* 12 N.Y.C.R.R. §146-2.14(e). As such, there is no genuine issue of material fact that runner/expeditor and busser/stocker qualify as employees similar to waiters or busboys. Defendants are therefore entitled to summary judgment dismissing the Fifth Claim for Relief.

**F.** **Summary Judgment Should be Granted to the Individual Defendants in Whole or in Part**

**1.** **There is no Individual Liability Under New York State Law**

Plaintiffs' Third, Fourth and Fifth Claims for Relief assert claims for violation of the New York law. Assuming *arguendo* that Plaintiffs could prove those claims at trial against

---

[29] In that respect, stockers serve the same purpose in the dining room as a barback, a tip eligible position under the Labor Law. The barback, along with busboys, wait staff, and several other occupations, is an exemplar of an occupation that may participate in a tip pool in the Minimum Wage Order for the Hospitality Industry that went into effect on January 1, 2011. *See* 12 N.Y.C.R.R. §146-2.14(e)(1), (3), (6). These regulations do not represent a change in the law, but merely a confirmation of what has always been – that "[e]ligible employees must perform, or assist in performing, personal service to patrons at a level that is a principal and regular part of their duties and is not merely occasional or incidental." 12 N.Y.C.R.R. §146-2.14(e).

Megu, summary judgment must be granted in favor of Defendants Origuchi, Yokoyama and Picardi because the NYLL does not impose liability on directors, officers or employees of a corporation.

New York Labor Law § 663.1 provides that "[i]f any employee is paid by his employer less than the wage to which he is entitled under the provisions of this article, he may recover in a civil action the amount of any underpayments ... and any agreement between him and his employer to work for less than such wage shall be no defense to such action." It is undisputed that at all times material hereto, Plaintiffs were employees of Megu. Plaintiffs performed their services at the restaurant operated by Megu; used equipment owned by Megu; served customers of Megu; and were paid by checks issued by Megu. Indeed, the consents to join the litigation signed by each of the Plaintiffs states that they are employees of Megu. As Plaintiffs' employer, Megu had the obligation to pay Plaintiffs the wages to which they were entitled under the provisions of NYLL.

The NYLL does not impose wage liability on officers or employees of a corporation. Instead, the NYLL exposes corporate officers and managers to criminal liability when they knowingly fail to pay wages to employees or violate the Labor Law. *See* N.Y. Lab. Law § 198-a; N.Y. Lab. Law § 662. In *Stoganovic v. Dinolfo,* 61 N.Y.2d 812, 462 N.E.2d 149, 473 N.Y.S.2d 972 (1984), the New York State Court of Appeals held that the statutory dichotomy of civil and criminal liabilities precludes any inference that officers and agents of a corporation can

be civilly liable for wages.  The Court of Appeals adopted the reasons stated in the decision of

the Appellate Division, which had held:

> Were we to hold corporate officers personally liable for the unpaid wages of
> corporate employees, the officers could have unlimited liability.  We cannot say
> that the legislature intended this result, and thus we decline to imply a civil cause
> of action based on the Labor Law.  If corporate officers are to have personal
> liability on unpaid wages, this is a decision the legislature must make.

*Stoganovic v. Dinolfo,* 92 A.D.2d 729, 730, 461 N.Y.S.2d 121, 123 (4th Dep't 1983).   The

absence of individual civil liability under NYLL was reaffirmed by the Court in *Patrowich v.*

*Chemical Bank,* 63 N.Y.2d 541, 543, 473 N.E.2d 11, 13, 483 N.Y.S.2d 659 (1984):  "Although

the definition in subdivision 3 of [NYLL] section 190 of 'employer' provides no clue, we have

recently held that the provisions of section 198-a subjecting corporate officers to criminal

sanctions for violation of the article indicates a legislative intent that they *not* be subject to civil

liability."  63 N.Y.2d at 543 (emphasis in original).

    *Patrowich* and *Stoganovic* require the summary dismissal of NYLL claims against

corporate owners, officers and managers.  For example, in *Ershow v. Site Holdings, Inc.*, 1995

U.S. Dist. Lexis 8908 (S.D.N.Y. June 26, 1995), three executives brought wage claims under

New York Labor Law § 191 against their employer as well as the CEO and a member of the

board of directors.   Citing *Stoganovic* and *Patrowich*, Judge Patterson dismissed the claims

asserted against the individuals:

> The New York Court of Appeals has held that corporate officers are not subject to
> civil liability under the provisions of *New York Labor Law § 198* . . .  Although
> these rulings do not expressly address *New York Labor Law § 191*, they clearly
> apply to all wage claims under Article 6 . . . Consequently, [the CEO] and [the
> member of the board of directors] have no liability in their capacity as corporate
> officers for Article 6 claims.

*Ershow,* 1995 U.S. Dist. LEXIS 8908 at *16.  *Accord, Robles v. Copstat Sec., Inc.*, 2009

U.S. Dist. Lexis 54963, at *12 (S.D.N.Y. June 29, 2009) ("Mere participation in the day-to-day

activities of an employer renders Bellistri an agent or officer.  Agents and officers are not subject to liability under the Minimum Wage Act absent piercing of the corporate veil.").  *See also Reese v. Lyons Equip. Co. Inc.*, 436 B.R. 281, 284 (W.D.N.Y. 2010) (explaining the court was bound by the New York Court of Appeals' decision in *Stoganovic* in its dismissal of plaintiff's New York Labor Law claim against an owner and officer of a corporation).

Likewise, New York state courts apply *Patrowich* and *Stoganovic* to dismiss wage claims against corporate officers, managers and directors.  *See, e.g.,  Renzler v. D.F. White, Inc.*, 267 A.D.2d 443, 444 (2d Dep't 1999) ("The Supreme Court erred in failing to dismiss the plaintiff's causes of action [for unpaid commissions] pursuant to Labor Law article 6 insofar as asserted against the individual defendants.  The Legislature clearly intended that corporate officers not be subjected to civil liability under that article of the Labor Law."); *Andux v. Woodbury Auto Park, Inc.*, 30 A.D.3d 362 (2d Dep't 2006) (holding individual was not liable pursuant to Labor Law Article 6 for the obligations of the corporate defendant).[30]

---

[30] The Second Circuit has not ruled upon the *Stoganovic/Patrowich* interpretation of the NYLL and recently explained that the New York Court of Appeals has not answered the question whether the employer test under NYLL is the same as under the FLSA.  *See Irizarry v. Catsimatidis*, 722 F.3d 99, 117 (2d Cir. 2013).  Although some district court decisions involving hybrid FLSA/NYLL claims have extended NYLL liability to individuals, those decisions typically fail to distinguish or even cite *Stoganovic* and *Patrowich.  See, e.g., Michalek v. Amplify Sports and Entm't LLC*, 2012 U.S. Dist. Lexis 85727, at *8 (S.D.N.Y. June 20, 2012) ("In determining whether a person is an 'employer' for purposes of the Labor Law, courts use an 'economic reality' test similar to that used under the Fair Labor Standards Act."); *Flannigan v. Vulcan Power Group, LLC*, 712 F. Supp. 2d 63, 68-69 (S.D.N.Y. 2010) ("Since [company defendants] are both limited liability companies, their corporate officers can come within this definition [N.Y. Labor Law § 193(3)] if they are proven to be Plaintiff's employers."); *Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp. 2d 253, 308 n.21 (S.D.N.Y. 2011); *Robles v. Copstate Security, Inc.*, 2009 U.S. Dist. LEXIS 54963, *12-13 (S.D.N.Y. June 29, 2009) (declining to apply the FLSA definition of an employer, explaining "the told of this Court is to 'anticipate hour the New York Court of Appeals would resolve this issue,' . . . and the narrower definition of employer conforms to Court of Appeals jurisprudence.")

Plaintiffs may seek to circumvent *Patrowich* and *Stoganovic* by arguing that they do not seek to hold the individuals liable as agents of Megu, but rather because they were the Plaintiffs' employer within the meaning of NYLL.  While an individual can certainly be an employer under NYLL, the flaw in Plaintiffs' argument is that there is no allegation (let alone proof) that the individuals were involved with the workers in their personal capacity.  Plaintiffs make allegations that the individuals are liable because they exercised control over the day-to-day operations of Megu.  Plaintiffs may not avoid the holdings of *Patrowich* and *Stoganovic* by dint of substituting prepositions to claim that the individuals are liable "as the employer" rather than "for the employer."

As properly interpreted and applied, NYLL does not impose personal civil liability on owners or managers of corporations.  Accordingly, Messers. Origuchi, Yokoyama and Picardi are entitled to summary judgment on Plaintiffs' state law claims asserted in their Third and Fourth Claims for Relief.

### 2.   Mr. Origuchi Is Not Any Plaintiffs' Employer for Purposes of the FLSA

Individual liability under the FLSA is premised upon "personal responsibility for making decisions about the conduct of the business that contributed to the violations of the Act." *Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 678 (1st Cir. 1998).  The Second Circuit has opined that "to be an 'employer,' an individual defendant must possess control over a company's actual 'operations' in a manner that relates to a plaintiff's employment ...  A person exercises operational control over employer if his or her role within the company, and the decisions it entails, directly affect the nature of conditions of the employees' employment ... the relationship between the individual's operational function and the plaintiffs' employment must be closer in degree than simple but-for causation." *Irizarry v. Catsimatidis*, 722 F.3d 99, 109-110 (2d Cir.

2013).   The Second Circuit explained that the answer depends on the totality of the circumstances, for which the factors of the "economic reality" test provide guidance. *See Id.* at 110.  Under the so-called "economic reality" test, courts consider whether the putative employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *Herman v. RSR Sec. Servs.*, 172 F. 3d 132, 139 (2d Cir. 1999).

In analyzing these factors, "the term 'employer' under the FLSA has been interpreted to include individuals with substantial control over the aspect of employment alleged to have been violated but not those who do not control the terms and conditions of employment." *Diaz v. Consortium for Worker Educ., Inc.*, 2010 U.S. Dist. LEXIS 107722, at *7 (S.D.N.Y. Sept. 28, 2010) (citation omitted).  Theoretical control or authority is insufficient. *See Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1161 (11th Cir. 2008) (finding "[u]nexercised authority is insufficient to establish liability as an employer").[31]  "A clear delineation of an individual's power over employees is an important factor in the 'economic reality' test." *Irizarry*, 722 F.3d at 111.  Origuchi did not exercise control in a way that directly affected the nature or conditions of any Plaintiffs' employment.

Origuchi was not employed by Megu nor did he directly own the company.  In any event, a corporate owner is not a statutory employer unless he exercises the requisite control over the employees and policies at issue. *See Irizarry*, 722 F.3d at 111 (explaining "[o]wnership, or a

---

[31]  Just as theoretical control or authority is insufficient to establish an individual is an employer, control or authority unrelated to the alleged wage violation is irrelevant to the analysis.  For example, the Director of Sales, even if an FLSA employer of the salespersons, cannot reasonably be liable for wages sought by warehouse workers.  Likewise, if the Director of Sales is demoted in 2007, then he would not be an "employer" of the salespersons in 2010.  Here, Plaintiffs' must prove that Origuchi was their employer during the alleged period of FLSA violations – *e.g.*, the two years prior to commencement of this action.

stake in a company, is insufficient to establish that an individual is an 'employer' without some involvement in the company's employment of the employees"); *Heng Chan v. Sung Yue Tung Corp.*, 2007 U.S. Dist. LEXIS 7770, at *37 (S.D.N.Y. Feb. 1, 2007) (dismissing a wage claim against a shareholder who's "investment did not carry with it managerial responsibility"); *Jankowski v. Castaldi*, 2006 U.S. Dist. LEXIS 4237 (E.D.N.Y. Jan. 11, 2006) (dismissing the case as to the individual defendant who did not participate in the operation of the business); *Bravo v. Eastpoint Int'l, Inc.*, 2001 U.S. Dist. LEXIS 3647 (S.D.N.Y. Mar. 30, 2001) (dismissing wage and hour claims against the owner and chairperson individually, holding that the fact that she was the owner and chairperson of the company alone was insufficient to hold her liable as an "employer").

Further, exercising the requisite control over the employees or policies at issue requires more than making recommendations on the same. As the court held in *In re Enter. Rent-A-Car*, the parent company's recommendations to a subsidiary were nothing more than suggestions which did not support a finding that the parent company was an employer of the subsidiary's employees. 683 F.3d 462 (3d Cir. 2012). The court explained that the parent company "had no more authority over the conditions of the assistant managers' employment than would a third-party consultant who made suggestions for improvements to the subsidiaries' business practices." *Id.* at 471.

In *Chao v. Vidtape, Inc.*, 196 F. Supp. 2d 281, 291 (E.D.N.Y. 2002), *modified on other grounds*, 66 Fed. Appx. 261 (2d Cir. 2003), an individual was not an employer, even though he was at the employer's premises, occasionally gave employees orders or directions, attended some employee meetings and employees believed he was a boss. The Secretary of Labor failed to prove that the individual defendant held "an integral role in the [defendant's] operations, or in

34

setting work policies, schedule or conditions of employment." *See also Solis v. Cindy's Total Care, Inc.*, 2012 U.S. Dist. LEXIS 1808 (S.D.N.Y. Jan. 5, 2012) (finding defendant who assisted in the management was not an employer because he did not engage in any independent managerial control over employees); *Sampson v. MediSys Health Network, Inc.*, 2012 U.S. Dist. LEXIS 103052, at *13-14 (E.D.N.Y. July 24, 2012) (dismissing claims against individual defendants who lacked operational control over the workers in question); *Martin v. Spring Break '83 Prods., LLC*, 2012 U.S. App. LEXIS 15285, (5th Cir. July 24, 2012) (finding individual defendants not FLSA employers because they did not independently exercise control over plaintiffs); *Gray v. Powers*, 673 F.3d 352, 355-56 (5th Cir. 2012) (finding a status-based inference of control – defendant had authority to hire and fire merely because he was a member and officer of the company – cannot alone suffice to create a genuine fact issue that defendant had the power to hire and fire the employees in question).

In *Mendez v. Stone Pizza, LLC*, 2012 U.S. Dist. LEXIS 108591 (S.D.N.Y. Aug. 1, 2012), this Court granted summary judgment to two individual defendants, even though the defendants interviewed the plaintiff, the plaintiff reported to the two individual defendants, the individual defendants paid the plaintiff and one individual defendant told the plaintiff that he (plaintiff) was not getting a raise. This Court explained that:

> [a]t most, this evidence shows that [the individual defendants] provided assistance to [the corporate defendant's] management in its hiring process, communicated management policies on wages and hours to employees, and on occasion exercised delegated authority in setting employee work schedules. This evidence is insufficient to create a question of material fact as to whether [the individual defendants] "possessed the power to control" [plaintiff] and satisfy the "economic reality" test.

*Mendez*, 2012 U.S. Dist. LEXIS 108591 at *4-5.

Here, Plaintiffs cannot demonstrate that Origuchi had operational control to affect the conditions of Plaintiffs' employment with Megu. Origuchi does not play a direct role in the operations of Megu, but instead provides advice to Megu's President who runs the company. Merely providing advice to Megu's President does not rise to the level of the operational control envisioned by the Second Circuit. While Origuchi may be aware of decisions of Megu's management or provide advice to Megu's management, Plaintiffs can present no admissible evidence that Origuchi made or had authority to make decisions affecting the conditions of Megu's employees. Accordingly, Origuchi, is entitled to summary judgment on Plaintiffs' federal claims asserted in their First and Second Claims for Relief.

## IV.    CONCLUSION

The admissible evidence and reasonable inferences that may be drawn therefrom demonstrates that Plaintiffs cannot present a valid claim for overtime or minimum wage and that Megu operates a tip program that complies with the FLSA and NYLL.  The propriety of Megu's tip pool is supported by the fact that the DOL already approved its use years prior to this lawsuit. Finally, Masahiro Origuchi's knowledge of some of Megu's operations and advice to Megu's management is not sufficient to meet the test for an employer under the applicable wage and hour laws.  As such, the Court should grant Defendants' motion for summary judgment in its entirety and dismiss all of Plaintiffs' claims.

Dated:    September 30, 2013
          New York, New York

                                         s/ Andrew P. Marks
                                        Andrew P. Marks
                                        Adam Colón
                                        LITTLER MENDELSON, PLLC
                                        900 Third Avenue
                                        New York, NY 10022
                                        Tel:  212-583-9600

                                        *Attorneys for Defendants*

Firmwide:120499245.4 050517.1009